1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   SEAN LOUIS ROWELL,

11                    Petitioner,                    No. 2: 09-cv-0776 KJN P

12          vs.

13   KEN CLARK,

14                    Respondent.              <u>ORDER</u>

15   _____/

16   I.  <u>Introduction</u>

17          Petitioner is a state prisoner proceeding without counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Both petitioner and respondent have consented to

19   the jurisdiction of the undersigned.  (Dkt. Nos. 5, 14.)

20          This action is proceeding on the amended petition filed September 8, 2009.  (Dkt.

21   No. 9.)  Petitioner challenges his conviction for arson of an inhabited structure (Cal. Penal Code

22   § 451(b)), explosion of a device with intent to injure or intimidate (Cal. Penal Code § 12303.3),

23   and use of a device designed to accelerate a fire (Cal. Penal Code § 451.1(a)(5)).  Petitioner is

24   serving a sentence of 13 years.

25          Petitioner raises the following claims: 1) jury instruction error (2 claims); 2)

26   violation of the Confrontation Clause; and 3) prosecutorial misconduct.  After carefully

1

1   reviewing the record, the undersigned orders the petition denied.

2   II.  Standards for a Writ of Habeas Corpus

3              An application for a writ of habeas corpus by a person in custody under a

4   judgment of a state court can be granted only for violations of the Constitution or laws of the

5   United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

6   interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

7   Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

8              Federal habeas corpus relief is not available for any claim decided on the merits in

9   state court proceedings unless the state court's adjudication of the claim:

10          (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
11          determined by the Supreme Court of the United States; or

12          (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
13          State court proceeding.

14  28 U.S.C. § 2254(d).

15             Under section 2254(d)(1), a state court decision is "contrary to" clearly

16  established United States Supreme Court precedents if it applies a rule that contradicts the

17  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

18  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

19  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06

20  (2000)).

21             Under the  "unreasonable application" clause of section 2254(d)(1), a federal

22  habeas court may grant the writ if the state court identifies the correct governing legal principle

23  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

24  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

25  simply because that court concludes in its independent judgment that the relevant state-court

26  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

2

1   application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

2   (2003) (internal citations omitted) (it is "not enough that a federal habeas court, in its

3   independent review of the legal question, is left with a 'firm conviction' that the state court was

4   'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas

5   relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

6   decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

7        The court looks to the last reasoned state court decision as the basis for the state

8   court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). If there is no reasoned

9   decision, "and the state court has denied relief, it may be presumed that the state court

10  adjudicated the claim on the merits in the absence of any indication or state-law procedural

11  principles to the contrary." Harrington, 131 S. Ct. at 784-85 (2011). That presumption may be

12  overcome by a showing that "there is reason to think some other explanation for the state court's

13  decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

14       Where the state court reaches a decision on the merits but provides no reasoning

15  to support its conclusion, the federal court conducts an independent review of the record.

16  "Independent review of the record is not de novo review of the constitutional issue, but rather,

17  the only method by which we can determine whether a silent state court decision is objectively

18  unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). Where no reasoned

19  decision is available, the habeas petitioner has the burden of "showing there was no reasonable

20  basis for the state court to deny relief. Harrington, 131 S. Ct. at 784. "[A] habeas court must

21  determine what arguments or theories supported or, . . . could have supported, the state court's

22  decision; and then it must ask whether it is possible fairminded jurists could disagree that those

23  arguments or theories are inconsistent with the holding in a prior decision of this Court. Id. at

24  131 S.Ct. at 786.

25  III.  Factual Background

26       The opinion of the California Court of Appeal contains a factual summary of

3

1  petitioner's offenses.  After independently reviewing the record, the undersigned finds this

2  summary to be accurate and adopts it herein:

3         On April 30, 2006, at around 3:20 a.m., a fire broke out at Richard
          Casity's house in Jackson. Ceecee Florez was in the garage of the
4         house across the street and heard a sound like fire igniting. She
          went outside and saw four-foot high flames across Casity's roof.
5
          Florez ran across the street and tried to wake Casity before going to
6         the side of Casity's house, where she found another fire. Florez
          used a water hose to douse the fire and returned to the front of the
7         house, where she handed the hose to Casity, who climbed a ladder
          to the roof.
8
          Casity lived in his home with his two daughters, one of whom was
9         at a friend's house. The other daughter, R.C., age 11, was severely
          autistic and asleep in the house. Casity was awakened by Florez
10        and went outside, obtained a ladder, and climbed to the roof, using
          the hose to put out the fire. R.C. remained asleep throughout the
11        fire.

12        Casity met defendant's girlfriend, Carletta Johnson, in January
          2006. Johnson recently had a baby born with disabilities and was
13        introduced to Casity through a friend. Johnson stayed at Casity's
          house several times in early 2006 when either of them needed help.
14
          Defendant worked on a ranch owned by Richard and Jonie
15        Woolstrum, where he lived in a trailer with Johnson. On
          Valentine's Day, defendant forcibly removed Johnson from
16        Casity's house and took her back to the trailer where she remained.

17        Johnson was trying to stop using drugs, so Casity helped her get
          into a drug treatment center in March 2006. On Easter Sunday,
18        April 16, 2006, Johnson invited defendant and the Woolstrums to
          dinner at the facility. When they arrived, a large bouquet of flowers
19        and card from Casity were visible. Upon seeing this, defendant's
          face "darkened" and "he became very angry." He whispered into
20        Johnson's ear, "Why would I send you flowers, bitch? You lost our
          kid."
21
          Johnson's relationship with defendant worsened after their baby
22        was born in December 2005. Testifying, Johnson confirmed
          defendant had physically abused her during their relationship,
23        including one incident in which he beat her with a hammer. Jonie
          Woolstrum related that defendant and Johnson had a "confused"
24        relationship, as Johnson loved but feared defendant. Both
          Woolstrums testified to frequently seeing Johnson with physical
25        injuries, and in their belief defendant physically and mentally
          abused her. Jessie Rameriez, who also worked at the ranch,
26        observed defendant's verbal abuse of Johnson, who was "pretty

                                        4

well banged up all the time, crying."

Ann Marie Francis, who was introduced to Johnson by a friend, once saw a bruise on Johnson's arm, which she said came from defendant grabbing her. Francis stayed at the ranch during May and June 2006 and once heard yelling and screaming from defendant's trailer. She visited defendant's trailer and observed Johnson had a black eye and bruises on her back. Johnson told Francis defendant had hit her.

Johnson completed the rehabilitation program in late April and returned to live with defendant. On April 30, 2006, defendant locked Johnson inside the trailer after he thought she had called Casity. Defendant entered the trailer at 3:00 a.m. and told her to get into the car. A small round ice chest was in the car, and defendant drove them to a spot near Casity's home. Inside the chest were two light bulbs with paper hanging out of the base. When they got there, defendant ordered Johnson to get out and they walked to the side of Casity's house.

According to Johnson, once they reached a neighbor's driveway, defendant took one of the light bulbs, lit it, and threw the device at Casity's house. Defendant, who had told Johnson to put on a pair of red gloves, then placed the other Molotov cocktail in her hand. He raised Johnson's hand and told her to throw the device, and, according to Johnson, defendant "coerced it" so the incendiary device was thrown at Casity's house. Before he handed the Molotov cocktail to her, defendant told Johnson this was the way to make her loyal to him.

When defendant handed the device to Johnson, the gas started to leak onto her hand and set it on fire, which caused her to remove the glove. The pair went to defendant's car, and during the drive home defendant told Johnson he loved her and knew she loved him.

Johnson testified that defendant then stopped by Rameriez's trailer at the ranch, where they met Rameriez, Francis, and another friend. Defendant told them he and Johnson did not go anywhere that night, and Rameriez was to be their alibi if anyone asked.

In May, Johnson went to her family's house because of defendant's abuse. She told her mother she and defendant had done something wrong, but could not say what happened because defendant was dangerous. Johnson returned to defendant in June, but went back to her mother after more abuse, this time confiding to her cousin Rebecca Ward that she and defendant had firebombed Casity's place. Ward, testifying, confirmed Johnson's testimony.

On August 8, 2006, Johnson told Casity about the incident. In addition to implicating defendant and herself, Johnson also falsely

implicated her cousin Travis Grow as well as Casity's ex-wife and a friend of the ex-wife. She talked to the police the next day and told the same story she had told Casity. According to Johnson, she was under the influence of methamphetamine when she spoke to the police.

On August 18, 2006, Johnson talked to her friend Jamie Villanueva and told him she and defendant had firebombed Casity's house, she had talked to the police, "and that I was looking at 23 years to life with no parole."

The next day Johnson called Casity and arranged to be picked up by the police. She made another statement to the police on September 19, in which she implicated only defendant and herself. According to Johnson, she was clean and sober when she made this statement and her previous statement to the police was not true.

While they were being transported in a van, defendant told Johnson that since she had told the "lie, I'm getting 23 years to life, that I should have threw the bomb when I had the whole family and even his retarded son was in the home and he wouldn't be in this mess." Defendant also said he would kill her as he had people on the outside.

Johnson admitted to a prior conviction for evading arrest and having entered a guilty plea to the burning of an inhabited structure (§ 452, subd. (b)) for her participation in the firebombing of Casity's house. She denied making a deal for immunity in exchange for testimony, but the court informed the jury Johnson did not understand the question.

The court told the jury that Johnson, who had been charged with the same offenses as defendant, pleaded guilty to burning an inhabited structure, a "reasonably related offense" which could be punished by two, three, or four years or probation and up to a year in jail, in exchange for all other charges being dismissed, but contingent upon her testifying truthfully. Defendant tried to cross-examine Johnson about the punishment she faced before making the agreement, but the court sustained the prosecution's objection and instructed the jury not to consider defendant's potential punishment in deciding whether he was guilty.

Richard Woolstrum recounted a discussion he had with defendant in April 2006. While the two were walking at the ranch, defendant said he was going to kill Casity. In July, Woolstrum went to the area around defendant's trailer where he found a great deal of burning. A decorative Manzanita bush was about one-third burned, and Woolstrum noticed glass near the base of the bush.

By this time Woolstrum had started to evict defendant, which led to several threats from defendant to kill him. In October, when

6

1   defendant left the trailer, Woolstrum walked around it again and
    noticed more evidence of fire along with burned gloves, light
2   bulbs, and light fixtures with bulbs in them.

3   Rameriez, who had pleaded no contest to possession of
    methamphetamine and was in custody on drug charges, worked at
4   the ranch from March to September 2006. In April she observed
    defendant in the ranch warehouse putting Styrofoam peanuts into a
5   light bulb. Rameriez also saw defendant put some type of material
    into the end of the light bulb. She heard defendant once say he was
6   upset because Johnson was "messing around" with Casity.

7   Rameriez and Francis testified regarding defendant's attempts to
    arrange an alibi at the ranch. According to Rameriez, defendant
8   drove up with Johnson in late April during the evening. Francis
    testified this incident took place on May 1, 2006, at around 7:00
9   a.m. According to Johnson, defendant drove up and tried to arrange
    his alibi at approximately 3:00 a.m. on April 30.
10
    A Jackson police detective found charred red material by the
11  driveway of the house next to Casity's. A wet spot next to the
    material smelled like gasoline. The detective found what appeared
12  to be remnants of a Molotov cocktail on the ground below the
    charred area on the north side of Casity's house.
13
    The incendiary device was a light bulb with the metal base
14  removed and wicking material stuffed inside. Glass fragments and
    a wicking material from the bottom portion of the device were
15  found on the roof. Pieces of glass were found fused to the shingles
    of the roof and Styrofoam was found melted onto rocks found at
16  the scene. The Styrofoam would help the burn by adhering to what
    it touched.
17
    Defendant's mother asserted her son was with her on the weekend
18  beginning April 30, 2006.

19  (Respondent's Lodged Document 5, at 2-9.)

20  IV.   Discussion

21              A.   Alleged Jury Instruction Error

22              Exhaustion

23          Respondent argues that petitioner's two claims alleging jury instruction error are

24  not exhausted.  The exhaustion of state court remedies is a prerequisite to the granting of a

25  petition for writ of habeas corpus.  28 U.S.C. § 2254(b)(1).  A petitioner satisfies the exhaustion

26  requirement by providing the highest state court with a full and fair opportunity to consider all

7

1   claims before presenting them to the federal court.  Picard v. Connor, 404 U.S. 270, 276 (1971);

2   Middleton v. Cupp, 768 F.2d 1083, 1086 (9th Cir. 1985).

3           Petitioner did not present these claims in his petition for review to the California

4   Supreme Court.  (Respondent's Lodged Document 6.)  Petitioner also did not file a habeas

5   corpus petition in state court.  Therefore, these claims are not exhausted.  Despite being

6   unexhausted, the undersigned may consider the merits of these claims because they are not

7   colorable.  28 U.S.C. § 2254(b)(2) (an application for writ of habeas corpus may be denied on the

8   merits notwithstanding the failure to exhaust state court remedies.)

9           *Legal Standard*

10          A challenge to jury instructions does not generally state a federal constitutional

11  claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v.

12  Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the

13  interpretation or application of state law.  Estelle, 502 U.S. at 62; see also Lincoln v. Sunn, 807

14  F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  The

15  standard of review for a federal habeas court "is limited to deciding whether a conviction

16  violated the Constitution, laws, or treaties of the United States (citations omitted)."  Estelle, 502

17  U.S. at 68.  In order for error in the state trial proceedings to reach the level of a due process

18  violation, the error had to be one involving "fundamental fairness."  Id. at 73.  The Supreme

19  Court has defined the category of infractions that violate fundamental fairness very narrowly.  Id.

20          Where what is at issue is the failure to give an instruction, petitioner's burden is

21  "especially heavy" because it has been held that "[a]n omission or an incomplete instruction is

22  less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145,

23  155.  (1977).  Moreover, a trial judge need not instruct on a defense which would be inconsistent

24  with petitioner's theory of the case.  Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984).

25  Failure to give a jury instruction under these circumstances will not amount to a due process

26  violation.  Id.

1    Furthermore, the Supreme Court has held that there is no unreasonable application

2  of federal law where a state appellate court decided that a jury instruction's single incorrect

3  statement of the "imperfect self-defense" standard did not render the instruction reasonably likely

4  to have misled the jury.  Middleton v. McNeil, 541 U.S. 433 (2004).

5    *Analysis*

6    In his first claim of jury instruction error, petitioner alleges that the trial court

7  erred by failing to sua sponte instruct the jury that oral admissions of petitioner must be viewed

8  with caution.  The California Court of Appeal denied this claim for the reasons stated herein:

9    Defendant contends the court committed reversible error in failing
    to instruct the jury that his oral admissions must be viewed with
10    caution. We find the error to be harmless.

11    Several witnesses testified regarding admissions made by
    defendant. Richard Woolstrum testified to defendant saying he
12    wanted to kill Casity. The testimony of Rameriez concerning
    defendant's being upset over Johnson's involvement with Casity,
13    as well as the testimony of Francis, Rameriez, and Johnson
    concerning defendant's efforts to get an alibi, also involved
14    admissions. Finally, Johnson testified to several other admissions
    by defendant when he ordered her into the car and told her to throw
15    the Molotov cocktail, as well as threats he made to her after their
    arrest.
16
    A trial court ordinarily has a sua sponte duty to instruct the jury
17    that evidence of a defendant's oral admissions must be viewed
    with caution. (People v. Slaughter (2002) 27 Cal.4th 1187, 1200;
18    People v. Beagle (1972) 6 Cal.3d 441, 455 (Beagle).) "The purpose
    of the cautionary instruction is to assist the jury in determining if
19    the statement was in fact made." (Beagle, supra, at p. 456.) The
    failure to give the instruction, however, "does not constitute
20    reversible error if upon a reweighing of the evidence it does not
    appear reasonably probable that a result more favorable to
21    defendant would have been reached in the absence of the error."
    (Id. at p. 455.)
22
    Regarding the alibi attempt, although Johnson, Rameriez and
23    Francis disagreed on the exact timing when this took place, they all
    agreed, through very similar testimony, that defendant had in fact
24    drove to Rameriez's trailer and sought to arrange the alibi. This
    renders harmless any error regarding these admissions. (See
25    Beagle, supra, 6 Cal.3d at p. 456 [failure to give instruction
    harmless where statement heard by two witnesses].)
26

1

2

3

4

5

> The failure to give the cautionary instruction is also harmless where "there was no issue of conflicting evidence in this case concerning the precise words used, their meaning or context, or whether the oral admissions were remembered and repeated accurately."  (People v. Bunyard (1988) 45 Cal.3d 1189, 1225.) In that context, where defendant simply denies the statements ever having been made, the failure to give the cautionary instruction is harmless error when the jury is properly instructed on evaluating a witness's credibility. (Ibid.)

6

7

8

> Defendant presented no conflicting accounts of what he allegedly admitted. To the extent he challenged the admissions, it was to deny having made the statements or attacking the credibility of the witnesses.

9

10

11

12

13

> The court properly instructed the jury on how to determine and weigh the credibility of witnesses by giving CALCRIM No. 226 relating to the credibility of witnesses generally, CALCRIM No. 302 regarding conflicts in testimony, and CALCRIM No. 334, to view Johnson's testimony with caution if the jury determined she was an accomplice. These instructions adequately allowed the jury to determine whether the witnesses' testimony concerning defendant's admissions was credible, rendering the court's error harmless.

14   (Respondent's Lodged Document 5, at 9-11.)

15          For the reasons stated by the California Court of Appeal, the undersigned finds

16   that the trial court's failure to sua sponte instruct the jury that petitioner's oral admissions must

17   be viewed with caution did not violate fundamental fairness.  As noted by the state appellate

18   court, regarding the alibi attempt, all witnesses agreed through similar testimony that petitioner

19   sought an alibi.  Moreover, petitioner denied making the statements the witnesses claimed he

20   made.  Thus, there was no conflicting evidence regarding what he said.  Based on this

21   circumstance, combined with the fact that the jury was properly instructed regarding how to

22   weight the credibility of witnesses, the undersigned finds no violation of fundamental fairness

23   based on the trial court's failure to give the at-issue instruction sua sponte.

24          Petitioner next argues that the trial court erred in failing to sua sponte instruct the

25   jury that Carletta Johnson was an accomplice as a matter of law whose testimony should be

26   viewed with caution.  The California Court of Appeal denied this claim for the reasons stated

1   herein:

2          The court instructed the jury with CALCRIM No. 334, which
           defines accomplice and instructed the jury that if it determined
3          Johnson was an accomplice, it could not convict defendant based
           on her testimony without supporting evidence, and must view her
4          testimony with caution. Defendant contends the court should have
           instructed the jury that Johnson was an accomplice as a matter of
5          law. He is mistaken.

6          Section 1111 defines accomplice "as one who is liable to
           prosecution for the identical offense charged against the
7          defendant...." This includes all principals in a criminal act. (People
           v. Tewksbury (1976) 15 Cal.3d 953, 960.) Criminal liability as a
8          principal attaches to those who aid in the commission of a crime
           only if they also share in the criminal intent or abet the crime (i.e.,
9          encourage it with knowledge of the wrongful purpose). (Ibid.)

10         Whether a witness is an accomplice is a factual question for the
           jury unless the facts are undisputed and support only one inference.
11         (People v. Brown (2003) 31 Cal.4th 518, 556-557.) An accomplice
           must knowingly, voluntarily, and with a shared intent join with the
12         principal offender in committing the crime. (People v. Perez (1973)
           9 Cal.3d 651, 658.) A person is not an accomplice as a matter of
13         law if there is evidence he or she acted out of fear of defendant.
           (People v. Anderson (1987) 43 Cal.3d 1104, 1138 [alleged
14         accomplice testified he acted out of fear of defendant rather than
           with the necessary criminal intent].)

15
           There is evidence Johnson did not share defendant's intent to
16         commit the arsons, but acted solely from fear of retribution by
           defendant. Johnson and others testified to defendant's abuse of her
17         and her fear of him. According to Johnson's testimony, defendant
           placed the Molotov cocktail in her hand, raised her arm, and then
18         "coerced" her into throwing it. Coupled with the testimony of
           defendant's prior abuse of Johnson, this is sufficient to leave the
19         question of whether Johnson was an accomplice to the jury.

20   (Respondent's Lodged Document, at 11-12.)

21          For the reasons stated by the California Court of Appeal, the undersigned finds

22   that the trial court's failure to sua sponte instruct the jury that Johnson was an accomplice as a

23   matter of law, whose testimony should be viewed with caution, did not violate fundamental

24   fairness.  Because there was evidence that Johnson did not share petitioner's intent to commit the

25   arson, and acted out of fear, the issue of whether Johnson was an accomplice was properly left

26   for the jury.

1    After conducting an AEDPA review, the undersigned finds that petitioner's

2  claims of jury instruction error are without merit.

3    B.   Alleged Confrontation Clause Error

4    Petitioner argues that the trial court violated his right to confront witnesses when

5  it prohibited him from cross-examining Johnson regarding the punishment she faced had she not

6  reached a plea agreement.  The California Court of Appeal denied this claim for the reasons

7  stated herein:

8    Defendant was allowed to cross-examine Johnson about her
   agreement with the prosecution, eliciting, through the court's
9    instruction to the jury, that she had faced the same charges as
   defendant, but was allowed to plead guilty to a lesser related
10   offense and have the remaining charges dismissed so long as she
   testified truthfully. The court did not allow defendant to question
11   her regarding the punishment she faced had there been no
   agreement, and instructed the jury it could not consider the
12   punishment defendant faced when determining any fact or the
   question of defendant's guilt.

13

   Defendant invokes his constitutional right under the confrontation
14   clause (U.S. Const., 6th Amend.) to explore a witness's bias
   against him. (Delaware v. Van Arsdall (1986) 475 U.S. 673,
15   678-679.) He contends the trial court abridged his right to confront
   an adverse witness by preventing him from questioning Johnson
16   about the punishment she faced had she not made a deal with the
   prosecution. We disagree.

17
   What Johnson stood to gain from her plea agreement with the
18   prosecution was relevant to her credibility. (See People v. Desantis
   (1992) 2 Cal.4th 1198, 1219-1220.) The potential punishment she
19   would avoid by pleading to a lesser offense is clearly relevant to
   this consideration. However, within the confines of the
20   Confrontation Clause (as well as the Evidence Code) the trial court
   retains wide latitude in restricting cross-examination that is
21   prejudicial, confusing, or of marginal relevance. (Delaware v. Van
   Arsdall, supra, 475 U.S. at p. 679; People v. Frye (1998) 18 Cal.4th
22   894, 946.) The trial court's exercise of this discretion does not
   offend the Confrontation Clause unless the prohibited
23   cross-examination would have produced a significantly different
   impression of the witness's credibility. (Delaware v. Van Arsdall,
24   supra, 475 U.S. at p. 680; People v. Frye, supra, 18 Cal .4th at p.
   946.)
25
   The jury knew Johnson faced substantially reduced charges as a
26   result of her agreement with the prosecution. She had also

1    previously testified on direct examination to telling Villanueva she
     was facing a sentence of 23 years to life. The court informed the
2    jury Johnson faced no more than a four-year term under her
     agreement and could get probation. Allowing defendant's question
3    would not have significantly changed the jury's perception of
     Johnson's credibility. The limitation on the cross-examination of
4    Johnson did not violate defendant's right to confrontation.

5    (Respondent's Lodged Document 5, at 12-14.)

6            The Confrontation Clause guarantees an opportunity for effective cross

7    examination, not cross examination that is effective in whatever way, and to whatever extent, the

8    defense might wish.  See Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam).  For

9    instance, the Confrontation Clause does not prevent a trial judge from imposing reasonable limits

10   on cross-examination based on concerns of harassment, prejudice, confusion of issues, witness

11   safety or interrogation that is repetitive or only marginally relevant.  Delaware v. Van Arsdall,

12   475 U.S. 673, 679 (1986).  However, "restrictions on a criminal defendant's rights to confront

13   adverse witnesses and to present evidence 'may not be arbitrary or disproportionate to the

14   purposes they are designed to serve.'"  Michigan v. Lucas, 500 U.S. 145, 151 (1991) (quoting

15   Rock v. Arkansas, 483 U.S. 44, 56 (1987)).  A defendant meets his burden of showing a

16   Confrontation Clause violation by showing that "[a] reasonable jury might have received a

17   significantly different impression of [a witness's] credibility . . . had counsel been permitted to

18   pursue his proposed line of cross-examination."  Van Arsdall, 475 U.S. at 680.

19           To determine whether a criminal defendant's Sixth Amendment right of

20   confrontation has been violated by the exclusion of evidence on cross-examination, a court must

21   inquire whether:  "(1) the evidence was relevant; (2) there were other legitimate interests

22   outweighing the defendant's interests in presenting the evidence; and (3) the exclusion of

23   evidence left the jury with sufficient information to assess the credibility of the witness."  U.S. v.

24   Beardslee, 197 F.3d 378, 383 (9th Cir. 1999) (citations omitted).

25           For the reasons stated by the California Court of Appeal, the undersigned finds

26   that the trial court's restriction on petitioner's cross-examination of Johnson did not violate the

13

Confrontation Clause.  Most importantly, the jury had sufficient information to assess Johnson's credibility despite the restriction on petitioner's ability to cross-examine her regarding the sentence she might have received had she not accepted the plea agreement.  As noted by the state appellate court, the jury knew that Johnson faced substantially reduced charges as a result of the plea agreement.  She also testified that she believed that she was facing a sentence of 23 years to life.  The trial court told the jury that she faced no more than a four year term under her agreement and could get probation.  Allowing petitioner to question Johnson regarding the sentence she faced had she not accepted the plea agreement would not have changed the jury's perception of her credibility.

After conducting an AEDPA review, the undersigned finds that this claim is without merit.

### C.  Alleged Prosecutorial Misconduct

Petitioner argues that the prosecutor committed misconduct during closing argument.  The California Court of Appeal denied this claim for the reasons stated herein:

> When cross-examining Johnson, defendant, representing himself, attempted to elicit the facts of her prior conviction for evading the police. She admitted to being in a drug treatment facility in 2002 and having been diagnosed with drug induced bipolar disorder or schizophrenia the same year. With respect to the evading conviction, Johnson stated she had been acquitted of the other charges against her stemming from that incident.

> During her closing argument, the prosecutor made the following statement: "Remember when Carletta Johnson got on the stand right away and, of course, who better to intimidate her, what better control, his last shot at her, better than having an attorney, isn't that interesting. He represents himself. Who better, more effective to get her to lose it on the stand than him? The ultimate control beyond this crime. What he starts out with, tries to make her sound like a criminal. You were accused of all these things. Yeah, I was acquitted of them. This evading as a felony, evading arrest, he starts right there. Starts intimidating her."

> Defendant contends the prosecutor committed prejudicial misconduct with this argument. We conclude the claim is forfeited.

> Defendant never objected to the prosecutor's argument. "'To

14

preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' [Citations.]"  (People v. Earp (1999) 20 Cal.4th 826, 858.) Alternatively, the failure to request an admonition is excusable if the request would have been futile. (People v. Hill (1998) 17 Cal.4th 800, 820.)

"A jury will generally be presumed to have followed an admonition to disregard improper evidence or comments, as '[i]t is only in the exceptional case that "the improper subject matter is of such a character that its effect ... cannot be removed by the court's admonitions." [Citation.]'"  (People v. Pitts (1990) 223 Cal.App.3d 606, 692.) The prosecutor's argument does not raise to this level, as an admonishment would have cured any prejudice from the prosecutor's remarks. Accordingly, we conclude defendant has forfeited his claim on appeal.

(Respondent's Lodged Document 5, at 14-16.)

Respondent argues that petitioner's prosecutorial misconduct claim is procedurally barred based on the finding by the California Court of Appeal that petitioner waived the claim by failing to object.  Federal courts may reach the merits of habeas petitions despite an asserted procedural bar so long as they are clearly not meritorious.  Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997).  Because the instant claim is without merit, the undersigned will not reach the procedural bar issue.

"A prosecutor's misleading and inflammatory arguments may violate a defendant's due process right to a fair trial." Sechrest v. Ignacio, 549 F.3d 789, 807 (9th Cir. 2008); Darden v. Wainwright, 477 U.S. 168, 181 (1986); Hein v. Sullivan, 601 F.3d 897, 912 (9th Cir. 2010).  "On federal habeas review, the narrow issue before [the Court] is whether the prosecutor's comments violated the defendant's due process right to a fair trial, not whether the prosecutor's comments constituted misconduct committed while the prosecutor was under the court's 'exercise of supervisory power.'"  Sechrest, 549 F.3d at 807 (quoting Darden, 477 U.S. at 181); see also Smith v. Phillips, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability

1    of the prosecutor.").

2            Determining whether a due process violation occurred requires an examination of

3    the entire proceedings so the prosecutor's remarks may be placed in their proper context.  Boyde

4    v. California, 494 U.S. 370, 384-85 (1990); Greer v. Miller, 483 U.S. 756, 765-66 (1987); see

5    also Hein, 601 F.3d at 912-13 ("In determining whether a comment rendered a trial

6    constitutionally unfair, factors [the Court] may consider are whether the comment misstated the

7    evidence, whether the judge admonished the jury to disregard the comment, whether the

8    comment was invited by defense counsel in its summation, whether defense counsel had an

9    adequate opportunity to rebut the comment, the prominence of the comment in the context of the

10   entire trial and the weight of the evidence.").  Moreover, "[p]rosecutorial misconduct which rises

11   to the level of a due process violation may provide the grounds for granting a habeas petition

12   only if that misconduct is deemed prejudicial under the 'harmless error' test ...," Shaw v.

13   Terhune, 380 F.3d 473, 478 (9th Cir. 2004); Sechrest, 549 F.3d at 808, which provides for

14   habeas corpus relief only if the error had a "'substantial and injurious effect or influence in

15   determining the jury's verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting

16   Kotteakos v. United States, 328 U.S. 750, 776, (1946)).

17           In the instant case, the prosecutor's comments did not misstate the evidence.  As

18   noted by respondent, in these comments the prosecutor sought to highlight petitioner's conduct in

19   order to show the nature of his relationship with Johnson.  The failure of the trial court to

20   admonish the prosecutor for these comments is attributable to petitioner who failed to object.

21   Most importantly, the evidence against petitioner was strong.  For this reason, the undersigned

22   cannot find that the at-issue argument had a substantial and injurious effect or influence on the

23   jury's verdict.  Accordingly, petitioner's prosecutorial misconduct claim is without merit.

24   V.  Conclusion

25           For all of the above reasons, petitioner's application for a writ of habeas corpus is

26   denied.

1    A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

2 applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

3 § 2253(c)(3).  For the reasons discussed above, no certificate of appealability is issued in this

4 action.

5    Accordingly, IT IS ORDERED that:

6    1.  Petitioner's application for a writ of habeas corpus is denied;

7    2.  A certificate of appealability is not issued.

8 DATED:  February 25, 2011

9

10

11

12    KENDALL J. NEWMAN
      UNITED STATES MAGISTRATE JUDGE
13

14 row776.157

15

16

17

18

19

20

21

22

23

24

25

26